UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MONSANTO COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:00CV84 CDP |
| | ) |
| HOMAN MCFARLING, | ) |
| | ) |
| Defendant. | ) |

**ORDER AND MEMORANDUM**

This is one of a number of "seed-saving" cases that Monsanto Company filed against farmers who had saved and replanted soybean seeds containing Monsanto's patented Roundup Ready technology. After partial summary judgment was granted and the parties had taken two interlocutory appeals, the issues of patent infringement damages and willfulness were tried to a jury. On April 28, 2005, the jury returned a verdict assessing Monsanto's damages at $273,188 and finding that plaintiff Homan McFarling's infringement was willful.

The case is now before me for entry of judgment, including Monsanto's request for treble damages, prejudgment interest, attorneys' fees, costs, and a permanent injunction. I will grant a permanent injunction, and will enter judgment for actual damages in the amount of $273,188, as found by the jury. I will also enter judgment for prejudgment interest in the amount requested by Monsanto, $103,130,

and will tax costs in favor of Monsanto in the amount of $20,303.25. I will deny Monsanto's request for treble damages or any other damages enhancement for willful infringement, and I will deny Monsanto's request for attorneys fees, as I find that McFarling's conduct here does not rise to the level of egregious behavior for which those patent remedies were designed.

## **Background**

Homan McFarling purchased and planted Roundup Ready soybeans in 1997 and 1998. He signed Monsanto's required technology agreement, acknowledging that the seeds contained patented technology and acknowledging that he would not save and replant any seeds generated from the use of the purchased crop. Despite signing the agreement, he saved and replanted seeds from each crop year. Monsanto brought this suit in January of 2000, and so McFarling's use of saved seeds in 2000 took place after the lawsuit was filed. At a preliminary injunction hearing held in April 2001, McFarling testified that he intended to use saved Roundup Ready seed again in 2001 unless enjoined. After the Court enjoined him from doing so, he did not replant any more saved Roundup Ready soybean seed.

Monsanto brought claims for infringement of two patents, breach of contract, conversion and unjust enrichment. McFarling filed counterclaims alleging violations of the Plant Variety Protection Act, the federal antitrust laws, and various other

issues of patent invalidity.

The litigation of this case was protracted, in part because of the novelty of this type of patent and in part because of the unsettled state of the law. The concept that a farmer could infringe a patent by growing a plant from seed he had harvested from his own crop was novel. There was an apparent conflict between the Plant Variety Protection Act, which allowed farmers to save protected seed for their own use, and utility patent law, which did not. I stayed certain aspects of the case for several months because a PVPA case was then pending before the United States Supreme Court. When it was decided, <u>J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred International, Inc.</u>, 534 U.S. 124 (2001), held that nothing in the PVPA prevented utility patents from being issued for plants, which had been an important and legitimate issue in this case. Additionally, there were two interlocutory appeals. The first followed my grant of the preliminary injunction. <u>Monsanto v. McFarling</u>, 302 F.3d 1291 (Fed. Cir. 2002). The Court of Appeals affirmed the preliminary injunction and, in a two-to-one decision, upheld the forum selection clause contained in Monsanto's technology agreement. The second interlocutory appeal followed my grant of partial summary judgment. <u>Monsanto v. McFarling</u>, 363 F.3d 1336 (Fed. Cir. 2004). The Court upheld summary judgment in favor of Monsanto on all of McFarling's counterclaims and defenses. It also upheld summary judgment

in favor of Monsanto on one of its contract claims as to liability, but found that Monsanto's liquidated damages clause, under which I had awarded contract damages, was invalid. That appeal did not consider whether my partial grant of summary judgment as to liability on one of the patent claims was valid.

After the case was remanded the last time, Monsanto elected to dismiss all claims other than its Count II, which was for infringement of the '605 patent. I had already granted summary judgment on liability on that Count, so the only issues submitted to the jury were those of damages and willfulness. After a three-day trial, the jury returned its verdict calculating a reasonable royalty as $40 per fifty-pound bag of seed, for a total actual damage award of $273,188. It also found that McFarling's infringement had been willful. Monsanto has now filed its motion for attorneys fees, costs, prejudgment interest and treble damages, and at trial it renewed its request for a permanent injunction.

## **Permanent Injunction**

Title 35, U.S.C. § 283 allows for the grant of injunctions "in accordance with the principles of equity . . . on such terms as the court deems reasonable." "It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it." Richardson v. Suzuki Motor Co. Ltd., 868 F.2d 1226, 1247 (Fed. Cir. 1989). "Although the district court's grant or denial of

an injunction is discretionary depending on the facts of the case, injunctive relief against an adjudged infringer is usually granted." W.L. Gore & Assoc., Inc. v. Garlock, Inc., 842 F.2d 1275, 1281 (Fed. Cir. 1988) (internal citations omitted). The Court must, of course, consider the equities of the particular case in deciding whether to grant injunctive relief.

Many courts have recognized that future infringement "may have market effects never fully compensable in money." Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1457 (Fed. Cir. 1988); Jeneric/Pentron, Inc. v. Dillon Company, Inc., 259 F. Supp. 2d 192, 195 (D. Conn. 2003). That is especially true in a case such as this where, even following a trial, it is not clear that damages can ever be calculated precisely for infringement of a patent on a self-replicating invention. This difficulty in measuring future damages shows that a permanent injunction is particularly appropriate in this case, and so I will enter a permanent injunction enjoining McFarling from further violation of the '605 patent. Monsanto's request for a broader injunction, which would enjoin McFarling from ever using Monsanto's Roundup Ready soybeans, is not supported by the evidence or by the law. McFarling has previously complied with Court orders, and there is no reason to believe that he would violate the narrower injunction.

## **Treble Damages and Attorneys Fees**

Monsanto seeks treble damages, because of the jury's finding that McFarling's infringement was willful, and attorneys fees, arguing that this is an "extraordinary" case. Although these two types of awards are authorized under separate sections of the patent law, I will consider them together because I believe the factual and equitable principles that underlie their grant or denial are similar.

Under 35 U.S.C. § 284, when there is willful patent infringement, the Court may "increase the damages up to three times the amount found or assessed." There is a two-step process for determining whether damages should be increased under this provision. Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996). The first step is to determine whether the infringer has engaged in conduct upon which increased damages may be based. The jury's finding of willfulness normally satisfies this test. The second step is for the court to determine the amount to increase the damages based upon a totality of the circumstances. "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." Read Corp v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992). In making this determination, the court must consider "factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating." Id. Read

examined a number of cases and listed nine factors that may appropriately be considered, including:

> (1) whether the infringer deliberately copied the ideas or design of another;
>
> (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
>
> (3) the infringer's behavior as a party to the litigation;
>
> (4) defendant's size and financial condition;
>
> (5) closeness of the case;
>
> (6) duration of the defendant's misconduct;
>
> (7) remedial action by the defendant;
>
> (8) defendant's motivation for harm; and
>
> (9) whether defendant attempted to conceal its misconduct.

Read, 970 F. 2d at 827.

The Court may also award attorneys fees in an "exceptional case." 35 U.S.C. § 285. Monsanto seeks attorneys fees in the amount of $468,094.85.

> The decision to award attorney fees under 35 U.S.C. § 285 in "exceptional" cases is discretionary with the trial court judge. Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989). "Among the types of conduct which can form a basis for finding a case exceptional are willful infringement, inequitable conduct before the P.T.O., misconduct during litigation, vexatious or

unjustified litigation, and frivolous suit." Id. at 1551. Amsted Industries Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 376 (Fed. Cir. 1994). Again, the cases have described a two-step process for determing whether to award fees: the court must first determine whether a case is exceptional, and then the court must determine whether attorney fees are appropriate. Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1460 (Fed. Cir. 1998).

There is no doubt that McFarling, at least in 2000, knew that he was infringing Monsanto's patent and knew that Monsanto intended to enforce the patent. He has testified at various times that he continued to save and replant the seed because he had always saved seed, because he believed that Monsanto could not keep farmers from farming the way they had always farmed, and because he made more money by saving and replanting his seed.[1] He has admitted that he did not know about the Plant Variety Protection Act or other specifics of patent or anti-trust law.

Despite all these admissions, I do not believe that this is an extraordinary case for which attorneys fees should be granted, nor do I believe that trebling or otherwise increasing the damages awarded by the jury is appropriate. McFarling

---

[1]Monsanto argues that these explanations are inconsistent, but I see nothing inconsistent about them.

did not attempt to conceal his replanting of the seeds, and he readily admitted having done so when questioned by Monsanto's investigators and during this litigation. He did not deliberately copy anything, he simply farmed the way he had always farmed. His conduct during the litigation has been entirely appropriate: he believed that there must be a defense to Monsanto's claim, sought counsel, and even gained the assistance of the Mississippi State University Extension Service in the case. Although his defenses were ultimately unsuccessful, some of them raised close questions of law. His counsel made legitimate and good-faith arguments challenging the patent. McFarling's stated intent to continue replanting saved seed unless enjoined was consistent with these defenses, and was made before the Supreme Court decided the J.E.M. case. The ability to harvest and replant seeds is, of course, the essence of farming, and it is a time-honored practice even in modern agriculture. It is not in the least surprising that a farmer such as McFarling would legitimately and in good faith question the right of any seed or technology company to change the way farmers have done business for centuries.

Monsanto's Roundup Ready technology, of course, has changed the way farmers have done business for centuries. It is a truly revolutionary technology, as demonstrated by its market success. In 1997 experts estimated that only about 15% of soybeans then being planted in the United States used the genetically modified

seeds. By the time of the 2005 trial, the number had risen to well over 90%. Monsanto allows other seed companies to use the technology, so the success of Monsanto's technology has allowed these seed companies to increase their sales. Monsanto's technology thus benefitted these unrelated seed companies, just as it benefitted the farmers by increasing their yields.

Monsanto's selected marketing method appears unique. Monsanto decided to charge the seed companies a relatively low license fee per bag of seed sold by the seed companies, but then to restrict the end users' – the farmers' – use of their own crops. In other words, "the Technology Agreement does not impose a restriction on the use of the <u>product purchased</u> under the license, but rather imposes a restriction on the use of the <u>goods made by</u> the licensed product." McFarling II, 363 F.3d at 1342-1343 (emphasis added). This is certainly a non-traditional licensing arrangement. Monsanto presented evidence of its reasons for choosing this marketing model, and the method was carefully chosen to increase Monsanto's revenue over a period of years to increase its ability to recover some of its extensive research and development investment. Had Monsanto simply charged the producing seed companies a much higher one-time or per-unit royalty for their use of the technology in the product they sold, the seed companies would have had to charge farmers much higher prices for the seed. This higher price to farmers would have

undoubtedly slowed the success of the product.  When the modified seed was new, it is unlikely that farmers would have been willing to pay a significant premium for the modified seed, and Monsanto's marketing studies confirmed this.  Further, any farmers who were willing to pay the higher premium would probably have chosen to do so only once, and would have saved and replanted their seed.  This would have caused Monsanto to lose control of its technology, which it legitimately did not want to do.  The marketing model certainly makes sense from Monsanto's perspective, but it is understandable that farmers found it suspicious.

The practical issues raised by this unique product and its unique marketing method are demonstrated by the evidence in the case.  Monsanto undertook a massive marketing and educational campaign directed to farmers.  In addition to touting the value of the seed, they also stressed the restrictions, and threatened to and did sue numerous farmers.  These suits against farmers such as McFarling who chose to fight Monsanto – and the farmers' lack of success – have been widely reported in the farm press.  This publicity has benefitted Monsanto and the seed companies.  The vast majority of cases filed by Monsanto against farmers have been settled before any extensive litigation took place, and the incidents of improper replanting have decreased.

It is not surprising that a unique product with a unique marketing method that

revolutionized soybean farming would also give rise to many novel legal issues. Although the J.E.M. case arose in a different context, it was not unreasonable for farmers to argue that the provisions of the Plant Variety Protection Act prohibited the type of patent here, or at least controlled on the issue of seed saving. Although Monsanto's interpretation of the law has prevailed, that was not necessarily a foregone conclusion. Additionally, at least one judge on the Federal Circuit believed that the forum selection clause used by Monsanto in all of its technology agreements was not valid. Monsanto v. McFarling, 302 F.3d 1291, 1299 (Clevenger, J, dissenting)(Fed. Cir. 2002)(McFarling I). The Federal Circuit also noted that its case law had not addressed the status of "restrictions placed on goods made by, yet not incorporating, the licensed good" under certain patent defenses. See McFarling II, 363 F.3d at 1343. Finally, of course, the liquidated damages provision that Monsanto crafted has been held to be invalid. See McFarling II, 363 F.3d at 1344-1350.

Monsanto turned out to be wrong about at least one aspect of its marketing plan – the liquidated damages clause. By one vote on the Federal Circuit, Monsanto might have been wrong about another aspect – the forum selection clause. Other aspects of the plan presented legal issues of first impression. I do not believe that McFarling, in his attempts to vigorously litigate the patent and defend what he

argues is his lifelong way of doing business, acted in bad faith or otherwise in such a way that exemplary damages or attorneys fees should be awarded.

The market and the legal system have upheld Monsanto's claims for the most part. Farmers, for the most part, have seen the handwriting on the wall and have agreed to Monsanto's terms. Those who initially did not agree have, for the most part, settled their cases when Monsanto sued them. Monsanto's marketing campaign and its aggressive enforcement of its patent rights against infringing farmers has had very good results for Monsanto. It seems unnecessary at best, inequitable at worst, to further punish one farmer who chose to mount a legitimate legal challenge.[2] I do not believe that McFarling's conduct here meets the type of exceptional case or willful violation that the remedies in Sections 284 and 285 were intended to remedy. While I am not disagreeing with the jury's finding of willfulness, because there is no doubt that McFarling knew he was violating the patent, at least in 2000 after he had been sued, I do not believe that imposing increased damages or attorneys fees in this case would be just.

---

[2]McFarling's conduct stands in stark contrast to that of some other farmers, such as Kem Ralph, who destroyed evidence, repeatedly lied, and refused to comply with court orders. See Monsanto v. Ralph, 382 F.3d 1374 (Fed. Cir. 2004). McFarling complied with the Court's injunction, participated in discovery, and appealed rulings he disagreed with. There is no element of bad faith in any of this conduct.

**Prejudgment Interest**

Monsanto seeks prejudgment interest in the amount of $103,130. Monsanto has submitted a schedule showing that this interest was calculated at prime rate, compounded annually, and beginning on May 1, 1999 and May 1, 2000 and ending on May 17, 2005.

General Motors Corp. v. Devex Corp., 461 U.S. 648 (1983), held that prejudgment interest should ordinarily be awarded in patent cases, but that such an award is not automatic. "For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit. There may be other circumstances in which it may be appropriate not to award prejudgment interest." Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 967 (Fed. Cir. 1986). Applying these standards, and having considered the parties' arguments, I conclude that Monsanto is entitled to prejudgment interest in this case.

**Taxable Costs**

After McFarling filed his brief in opposition to Monsanto's request for taxable costs, Monsanto reconsidered its request and removed certain items that are not properly taxable under 28 U.S.C. § 1920. I have carefully reviewed the items in Monsanto's revised request for costs and find that they are all properly taxable. I

will therefore direct the Clerk to tax as costs the total amount of $20,303.25, which consists of deposition expenses in the amount of $5,825.30, costs of copies for use at trial in the amount of $10,968.95, and costs of the transcript in the amount of $3,509.00.

For the reasons set forth herein,

**IT IS HEREBY ORDERED** that Monsanto's motion for attorneys fees, costs, prejudgment interest, and treble damages [#285] is granted in part and denied in part, as follows:

Monsanto is entitled to actual damages in the amount of $273,188, as set forth by the jury's verdict, along with prejudgment interest in the amount of $103,130, for a total judgment of $373,318.

Monsanto's request for entry of a permanent injunction is granted, with modifications.

Monsanto's request for enhanced damages and attorneys fees is denied.

The Clerk of Court shall tax as costs the sum of $20,303.25.

A separate judgment, including a permanent injunction and the damages

awards set out above, is entered this same date in accordance with this

memorandum and order.

                                               _____
                                               CATHERINE D. PERRY
                                               UNITED STATES DISTRICT JUDGE

Dated this 23rd day of June, 2005.